10-2723.121-RSK                                          August 20, 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ELENA DIADENKO, SALLY CHIODO,
and ANDREW BREEN,                    )
                    Plaintiffs,      )
                                     )
                    v.               )    No. 10 C 2723
                                     )
MARY ANN FOLINO and THE BOARD OF     )
EDUCATION FOR CHICAGO PUBLIC         )
SCHOOL DISTRICT                      )
#299,                                )
                                     )
                    Defendants.      )

## MEMORANDUM OPINION

Before the court is the motion for summary judgment of defendants Mary Ann Folino and The Board of Education for Chicago Public School District #299 (the "Board"). For the reasons explained below, we grant the defendants' motion.

## BACKGROUND

Plaintiffs Elena Diadenko, Sally Chiodo, and Andrew Breen worked for Schurz High School ("Schurz") during the time period relevant to this lawsuit. They allege that Folino, Schurz's principal, improperly disciplined them for criticizing the way that Folino and her staff ran the school, and that the Board has a policy or practice of "deliberate indifference to whistleblowers." (Pls.' Resp. at 11.) We will discuss the facts relevant to each plaintiff separately because their claims are based upon largely independent facts.

1.  **Sally Chiodo**

In 2008, Chiodo was employed as Folino's secretary and as
Schurz's treasurer. (See Defs.' Joint Local Rule 56.1(a)(3) Stmt.
of Material Facts (hereinafter, "Defs.' Stmt."), ¶¶ 1, 4, 29.) At
that time, and for some years prior, Chiodo earned substantial
overtime pay: between $18,000 and $19,000 per year. (Id. at ¶ 3.)
In June 2008, Folino informed Chiodo that the school could no
longer afford to pay her overtime. (Id.) Shortly after Folino
broke the news to Chiodo, documents began to disappear from
Folino's office. (Id. at ¶¶ 5, 7.) Folino suspected that Chiodo
was the culprit, (see Folino Dep., attached as Ex. D to Defs.'
Stmt., at 20-21, 24), and at some point that summer she saw Chiodo
removing documents from the school. (See Pls.' Stmt. of Add'l
Facts ¶ 31.) Chiodo admits that she removed documents from the
school and admits that it was wrong to do so. (See Defs.' Stmt. at
¶¶ 5-6, 9.) At least initially, it appears that Chiodo took
documents that she believed demonstrated that the school had funds
available to continue paying her overtime. (See Chiodo Dep.,
attached as Ex. B to Defs.'s Stmt., at 154.) This led to — or was
part of — a broader effort to find other financial improprieties at
the school. (Id.; see also Defs.' Stmt. ¶ 9.) The defendants
contend that a few weeks after Folino eliminated Chiodo's overtime
eligibility Chiodo angrily confronted Folino, her assistant
principal Debra Neiman, and others, and threatened to call the

Illinois Inspector General about unspecified wrongdoing. (See Defs.' Stmt. ¶ 10; see also Folino Dep. at 40 (testifying that Chiodo called her co-workers "whores" and told Folino, "you don't know who you're messing with . . . I'm going to take innocent people down with me because you don't know who you're messing with, I can buy and sell you, and I'm going to call the IG."); Neiman Dep., attached as Ex. N to Defs.' Stmt., at 87 (testifying that Chiodo "called [us] a bunch of whores and proceeded to tell us she could buy and sell us all").) Chiodo denies that she threatened to call the Inspector General, denies that she insulted anyone, and appears to deny that this meeting ever happened. (See Chiodo Dep. at 101-104.) Folino consulted Jim Ciesil, an attorney in the Board's law department, about Chiodo's behavior and he recommended that Folino remove Chiodo as treasurer. (See Defs.' Stmt. ¶ 11.) However, Folino did not remove Chiodo as treasurer at that time. (See id. at ¶ 29.)

Sometime in October 2008, Folino removed Chiodo as her secretary and transferred her from an area immediately outside Folino's office to a cubicle. (Id. at ¶ 26.)[1] Chiodo retained the same general job title ("School Clerk 1") and, as far as we can tell, received the same salary and benefits in her new situation.

---

[1] The plaintiffs deny this statement, but they do not cite any evidence supporting their denial. Moreover, the defendants' statement refers to Chiodo's own deposition, which generally confirms that Folino removed Chiodo as her secretary in October.

- 4 -

(Id.; see also Chiodo Dep. at 9-10 (testifying that school clerks perform a variety of specific functions (such as secretary, treasurer, etc.) but are "all paid under the School Clerk 1, Grade 9 label.").) Chiodo's new situation entailed a later start time each work day, 9:00 a.m. instead of 7:30 a.m. (Defs.' Stmt. ¶ 27.) Chiodo testified that around this same time period — October or November 2008 — workers removed carpet and asbestos tiles from her work area. (See Chiodo Dep. at 87-95.) Her testimony is somewhat difficult to follow, but we gather that the tiles were removed from her previous work area immediately outside Folino's office, which suggests that the removal took place sometime in or before October, when Folino moved her to the cubicle. (See Chiodo Dep. at 93-94; but see id. at 86-87 (testifying that the tiles were removed in November).) In any case, the asbestos removal occurred before Chiodo's first letter to the Office of the Inspector General ("OIG") on or about November 9, 2008. (See Defs.' Stmt. ¶ 15; see also id. at ¶ 112 (indicating that the Inspector General's first record of a complaint from the plaintiffs was received on November 14, 2008); Letter, dated Nov. 9, 2008, attached as Ex. 2 to Chiodo Dep., at 4 (letter from Chiodo to the OIG and other Chicago Board of Education executives discussing asbestos removal).) Chiodo appears to deny that this was her first "contact" with the OIG, but she has not cited any record evidence establishing that she contacted the OIG earlier. (See Pls.' Resp. to Defs.' Stmt. ¶ 15.)

- 5 -

Chiodo's first letter accused Folino of falsifying her own Local School Council ("LSC") evaluation and improperly removing one LSC member, Ann Madea, and replacing her with one of Folino's "cronie[s]." (See Letter, dated Nov. 9, 2008, at 1-2.) Besides these specific incidents, Chiodo indicated in her letter that she wanted to discuss "approximately 8 other questionable issues." (Id. at 3.) Finally, Chiodo's letter contained a number of complaints about the way that Folino had treated her personally. (Id. at 3-4.)

The defendants contend that Folino learned sometime after the 2008 Christmas holiday that Chiodo had contacted the OIG. (Defs.' Stmt. ¶ 17.) But other evidence suggests that she learned earlier in December. (See Pls.' Resp. to Def.'s Stmt. ¶ 17; see also Email from D. Temkin to R. Slingerland et al., attached as part of group Ex. C to Defs.' Stmt. (email from Temkin to an OIG representative, Chiodo, Folino, and others stating that "[w]e are prepared to disclose the information that we have and trust that you will proceed accordingly"); Temkin Dep., attached as part of group Ex. C to Defs.' Stmt., at 165-66; Folino Dep. at 146 (appearing to give an earlier date — "December 2008, late November or December" — for when she first learned that Chiodo had contacted the OIG).) On December 16, 2008, a substitute teacher named Ann Curriere threw a bag containing a plastic rat on Chiodo's desk. (Defs.' Stmt. ¶ 61; see also Investigative Summary, dated Jan. 14, 2009, attached as

- 6 -

part of group Ex. 4A to Pls.' Resp., at 1.) Chiodo told an OIG investigator that before throwing the bag on her desk, Curriere stated: "Tell me you're not the whistleblower." (See Case Activity Report, dated Dec. 17, 2008, attached as part of group Ex. 4A to Pls.' Resp.) Folino's then-secretary, Patricia Elias, told an OIG investigator that Curriere visited Folino in her office for approximately 20 minutes before the incident and emerged from her office with a bag. (See Pls.' Supp. Stmt. of Facts ¶ 28.) Folino denies that she had any knowledge of Curriere's plans and states that she first learned about the incident when two Chicago Police Officers contacted her after it had happened. (See Defs.' Stmt. ¶ 61; Defs.' Resp. to Pls.' Supp. Stmt. of Facts ¶ 28.) The plaintiffs have not cited any contrary evidence.

On or about December 21, 2008, Chiodo sent a letter to Ciesil — the CPS attorney with whom Folino had previously spoken about Chiodo's behavior — accusing Folino of falsifying her own performance evaluation. (See Letter from S. Chiodo to J. Ciesil, dated December 21, 2008, attached as Ex. 1 to Chiodo Dep.)[2] The parties agree that Chiodo sent numerous other letters complaining

---

[2] Chiodo also accused Folino of moving her to a cubicle "in retaliation for contacting the Inspector General." (See Letter from S. Chiodo to J. Ciesil, dated Dec. 21, 2008, at 3.) But the plaintiffs admit that Chiodo contacted the OIG *after* Folino moved Chiodo to the cubicle. (See Pls.' Resp. to Defs.' Stmt. ¶ 15.) The rest of her letter is devoted to Chiodo's theory that Folino resented her because other employees supported Chiodo after Folino discontinued her overtime.

about Folino.[3]  The defendants summarize her other complaints as follows: (1) Folino engaged in "ghost student enrollment;" (2) she ordered too much food for school functions; (3) she paid too much for school apparel; (4) she conducted school business with a friend; (5) she paid a tip at a local restaurant from internal school accounts; (6) she paid students who provided information about gang and graffiti activities; (7) she allowed her son to volunteer to install a new sound system at the school; (8) she lived in Cicero instead of Chicago; and (9) she used "excessive profanity and smoked in her office." (Defs.' Stmt. ¶¶ 12, 86.) However, the parties have not attached the letters to their summary judgment materials, nor have they cited any other evidence establishing exactly what Chiodo said and when she said it.[4] Folino removed Chiodo's duties as treasurer in February 2009. (Id. at ¶ 29; see also id. at ¶ 25.)  Also in February 2009, Chiodo and several other school staff members lost their personal parking

---

[3]/  Chiodo estimates that she sent approximately 50 letters. (See Chiodo Dep. at 167.)  The defendants contend that she sent more than 80 letters. (See Defs.'s Stmt. ¶ 12.)

[4]/  We gave the parties an opportunity to supplement the record, but they chose not to add any materials that were not already in the record.  Nor have they clarified the timing of Chiodo's complaints.  The plaintiffs' supplemental statement relies heavily on the OIG complaint log attached to their response brief.  (See Pls.' Supp. Stmt. ¶¶ 6-12, 14-17.)  The log does not contain any dates, and the plaintiffs have not attempted to link the complaint log to other evidence to establish a coherent timeline.  It may be possible to glean the context of Chiodo's complaints from other evidence in the record, but it is not our responsibility to comb the record searching for evidence supporting the plaintiffs' claims.  See, e.g., United States v. 5443 Suffield Terrace, Skokie, Ill., 607 F.3d 504, 510 (7th Cir. 2010) ("[S]ummary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it was not the district court's job to sift through the record and make Connors's case for him.").

spaces when the school underwent renovations to comply with the Americans With Disabilities Act ("ADA"). (<u>Id.</u> at ¶ 28.) Chiodo retired in March 2010. (<u>Id.</u> at ¶ 106.)

### 2. Elena Diadenko

Folino hired Diadenko as a special education teacher in September 2009. (<u>Id.</u> at ¶ 54.) Within two weeks of being hired, Diadenko began complaining to Neiman, who oversaw the Schurz's special education department, that the department was doing "everything wrong." (<u>Id.</u> at ¶ 42.) She specifically complained about the school's special education case manager, "Dr. Condie," stating that she was not qualified to be a case manager and questioning the number of hours she worked. (<u>Id.</u>; <u>see also</u> Folino Dep. at 104 (testifying that Diadenko complained that Condie was not working hours sufficient to handle her responsibilities as case manager).) The parties agree that Diadenko soon began complaining to the Illinois State Board of Education ("ISBE") about Schurz's special-education department. (<u>See</u> Pls.' Stmt. of Add'l Facts ¶ 36 Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 36.) As early as September 2009, Folino and Neiman were in regular contact with Rebecca Clark ("the person running the special education department for CPS"), the Board's Office of Special Services ("OSS"), and the ISBE about Diadenko's compliants. (Defs.' Stmt. ¶¶ 43-46.)

On October 30, 2009, Folino gave Diadenko a "Notice of Pre-Discipline Hearing" in connection with several incidents that occurred on or around October 21, 2009. (<u>See</u> Defs.' Stmt. ¶¶ 49,

96; see also Notice of Pre-Discipline Hearing, dated Oct. 30, 2009, attached as part of group Ex. O to Defs.' Stmt.) Folino charged Diadenko with violating school policy by failing to report a matter involving the Department of Children and Family Services ("DCFS") to a member of the school's administration, and with disclosing confidential and/or sensitive information about students in emails to staff members at Schurz and two other schools. (See Notice of Pre-Discipline Hearing at 1.) The Notice of Pre-Discipline Hearing also refers to other instances of combative and/or disruptive behavior by Diadenko. (Id. at 2.) Folino suspended Diadenko for three days in connection with these charges. (See Notice of Disciplinary Action, dated Nov. 12, 2009, attached as part of Group Ex. O to Defs.' Stmt.) Diadenko appealed her suspension to the Board, and lost. (See Defs.' Stmt. ¶ 96; see also Letter from C. Colston to E. Diadenko, dated Jan. 7, 2010, attached as part of Group Ex. O to Defs.' Stmt. (informing Diadenko that her three-day suspension was upheld and stating that it would be served February 3-5, 2010).)

In late November 2009, Diadenko sent a letter to the Mayor of Chicago complaining about certain practices in Schurz's special education department. (See Defs.' Stmt. ¶ 104; see also Investigative Memo., dated Feb. 3, 2010, attached as Ex. P to Defs.' Stmt., at 1 (describing a letter from Diadenko to former-Mayor Daley dated November 28, 2009).) The parties have not included Diadenko's letter in their summary judgment materials, but

- 10 -

we gather from the report of Ray Poloko, the CPS investigator assigned to investigate Diadenko's claims, that Diadenko's letter raised the following concerns: (1) Schurz teachers were being required to write Individual Education Programs ("IEP") for students they did not teach;[5] (2) some special-education students were inappropriately placed in "regular" classes without a special-education teacher; (3) some staff members were unaware of the health problems of particular students (e.g., asthma) because they were not given the students' IEP's; (4) the school was using outdated standardized tests; and (5) Neiman was unqualified to oversee the special-education department. It is unclear when — or even if — Folino learned that Diadenko sent this letter. Poloko's report does indicate, however, that he interviewed Folino in connection with Diadenko's allegations on January 26, 2012. (Investigative Memo., dated Feb. 3, 2010, at 4.)

On or about January 4, 2010, Folino gave Diadenko another "Notice of Pre-Discipline Hearing." (See Notice of Pre-Discipline Hearing, dated Jan. 4, 2010, attached as part of group Ex. O to Defs.' Stmt.) This notice accused Diadenko of sending a letter to an LSC member containing a printed copy of an email that had been

---

[5] Under the Individuals with Disabilities Education Act, "the States receive federal funding for the education of disabled children on the condition that their local school districts comply with the procedural requirements of the Act and provide a 'free appropriate public education' to all resident children with disabilities." Jamie S. v. Milwaukee Public Schools, 668 F.3d 481, 485 (7th Cir. 2012). One of those procedural requirements is the development of an IEP, "a written statement for each child with a disability that is developed, reviewed, and revised in a meeting in accordance with" certain prescribed procedures. 34 C.F.R. § 300.320.

one of the bases for Diadenko's earlier suspension. (Id.) According to the notice, the email enclosed in the letter contained confidential information about a student at the school, and included a handwritten note: "Mrs. Durbin[,] more wrong by principal as Schurz LSC look the other way[.] Clean it up for the students." (Id.) The notice also accused Diadenko of disrupting a student evaluation by refusing to participate without a union representative present. (Id.) In addition, the "Discipline Hearing Summary" related to these charges accused Diadenko of referring to Folino as the "Italian Mafia" and equating her with a "Nazi concentration camp leader." (Discipline Hearing Summary, dated Jan. 4, 2010, attached as part of Group Ex. O to Defs.' Stmt., at 1.) Folino suspended Diadenko for 10 days without pay in connection with these charges. (See Notice of Disciplinary Action, dated January 22, 2010, attached as part of Group Ex. O to Defs.' Stmt.) The Board issued a "formal Warning Resolution" to Diadenko in May 2010 after upholding her ten-day suspension on appeal. (Defs.' Stmt. ¶ 103.)[6]

### 3. Andrew Breen

Breen began working at Schurz in July 2009 as a special education teacher, his first teaching position after completing college. (See id. at ¶ 62.) At a meeting held shortly before the

---

[6]  The content of the "Warning Resolution," and its consequences for Diadenko, are unclear.

- 12 -

children were to begin the 2009-2010 school year, Breen complained
that Schurz was using outdated standardized tests. (Pls.' Supp.
Stmt. (Dkt. 33) ¶ 37.)[7]  Although Breen was informed that he was
responsible for completing student IEP's, he disregarded that
responsibility shortly after the school year began. (Id. at ¶ 67.)
This precipitated a meeting in October 2009 at which Neiman
reminded Breen that he was responsible for preparing IEP's in
advance of IEP meetings. (Id.)  In approximately November or
December 2009, Breen sent a letter to Poloko, the CPS investigator
assigned to investigate Diadenko's allegations, "complaining about
how Breen thought the special education program at Schurz should
have been run." (Id. at ¶ 69.)  Breen testified at his deposition
that "around" the time he sent a letter to Poloko, Folino told him
"not to break ranks." (Id.)  Breen was vague in his deposition
about what prompted Folino's statement. (See Breen Dep. at 41 ("It
had something to do with me questioning Dr. Condie or, you know, it
had something to do with my recent concerns about the special ed.
practices.  I can't be more specific than that.").)  In January
2010, Breen emailed his college teachers asking whether they
believed Schurz's practices were "normal." (Defs.' Stmt. ¶ 74.)

_____

[7]  Plaintiffs contend that Breen complained at this same meeting about
student "caseloads," and the fact that one teacher (rather than the entire IEP
"team") was responsible for drafting student IEP's. (Pls.' Supp. Stmt. (Dkt. 33)
¶¶ 38-39.)  Breen actually testified that other teachers raised these concerns.
(See Breen Dep., attached as Ex. H to Defs.' Stmt., at 20-21.)  In a similar
vein, the plaintiffs contend that Breen complained about parents not being
notified of IEP meetings. (See Pls.' Supp. Stmt. (Dkt. 33) ¶ 70.)  In fact,
Breen testified only that he was aware of the problem, not that he complained
about it to anyone. (See Breen Dep. at 69-70.)

- 13 -

Between December 1, 2009 and February 2010 Breen received several "non-disciplinary" warnings from Neiman and Folino about completing IEP's on time, properly logging academic performance, and arriving at school on time. (Id. at ¶¶ 71-73, 75-77.) During this same time period Breen also received a generally positive review of his classroom performance. (Id. at ¶ 79.) Folino gave Breen his year-end teacher evaluation on March 17, 2010. (Id. at ¶ 81.) Folino's evaluation discussed Breen's strengths and weaknesses, including Breen's lack of preparation. (Id.) At no point was Breen suspended or formally disciplined for any reason. (Id. at ¶ 82.) The plaintiffs insist that his "evaluation was lowered by Folino," (Pls.' Resp. to Defs.' Stmt. ¶ 82), but the record does not support this contention. (See Breen Dep. at 94 (vaguely suggesting that his teacher evaluation would have been more positive but for Folino's alleged animus).)

## DISCUSSION

The plaintiffs have filed a six-count complaint asserting claims for First Amendment retaliation (Count I), "class of one" equal protection (Count II), asbestos exposure (Count III, asserted by Chiodo only), violation of the Chicago Public Schools's "whistleblower" statute (Count IV), violation of the Illinois "whistleblower" statute (Count V), and intentional infliction of emotional distress ("IIED") (Count VI). The defendants have moved for summary judgment on all of the plaintiffs' claims. In response

- 14 -

to the defendants' motion, the plaintiffs have abandoned their class-of-one equal protection claim (Count II). (See Pls.' Resp. at 10.) With respect to their other claims, the plaintiffs argue that there are material factual disputes that entitle them to proceed to trial.

## A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

- 15 -

**B.    First-Amendment Retaliation (Count I)**

The plaintiffs have filed claims for damages against both Folino and the Board for First-Amendment retaliation.  In their complaint, the plaintiffs indicate that they are suing Folino in her "official capacity."  (Compl. ¶ 13.)  On that basis, the defendants have moved to dismiss the plaintiffs' claims against her as redundant: a suit against Folino in her official capacity is really a suit against the Board, and the Board is already a named defendant.  See Jungels v. Pierce, 825 F.2d 1127, 1129 (7th Cir. 1987); see also Toronyi v. Barrington Community Unit School District 220, No. 03 C 3949, 2005 WL 388568, *7 (N.D. Ill. Feb. 10, 2005) (dismissing official-capacity claims against a municipal officer in similar circumstances).  The plaintiffs effectively admit that their claims against Folino are redundant as currently pled, but request leave to amend their complaint. (See Pls.' Resp. at 3.)  There is no indication that Folino would have litigated this case differently if the plaintiffs' complaint had named her as a defendant in her individual capacity. (See Defs.' Reply at 2 (stating that the Board has provided Folino with a separate attorney and that she has attended all the depositions taken in this case.).)  Therefore, we will grant the plaintiffs leave to amend their complaint to sue Folino in her individual capacity. See Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave

- 16 -

[to amend the complaint] when justice so requires."). In the interests of efficiency, we will deem the plaintiffs' complaint amended *instanter*.

To prevail on their retaliation claims, the plaintiffs must prove that: "(1) [their] speech was constitutionally protected; (2) the protected speech was a but-for cause of the employer's action; and (3) [they] suffered a deprivation because of the employer's action." Wackett v. City of Beaver Dam, Wis., 642 F.3d 578, 581 (7th Cir. 2011). We apply a two-part test to determine whether a public employee's speech is protected. See Spiegla v. Hull, 481 F.3d 961, 965 (7th Cir. 2007). First, we ask whether the employee "spoke as a citizen on a matter of public concern." Id. (citation and internal quotation marks omitted). If so, we go on to balance the employee's interest in speaking against the employer's interest "in promoting effective and efficient public service." Id.

## 1. Whether the Plaintiffs Spoke "As Citizens"

The defendants argue that the plaintiffs were speaking *as employees*, not "as citizens," and therefore their complaints about Schurz were not protected by the First Amendment. See Garcetti v. Ceballos, 547 U.S. 410, 420-25 (2006). In Garcetti, a deputy district attorney challenged the accuracy of an affidavit used to obtain a search warrant. Id. at 414. He told his supervisors about his concerns and recommend that they dismiss the underlying criminal case. Id. The plaintiff's statements upset his superiors

- 17 -

and allegedly led to a series of retaliatory employment actions. Id. at 414-15. The Supreme Court concluded that the plaintiff's complaints to his supervisors were not entitled to First Amendment protection because they made pursuant to the plaintiff's official duties as a prosecutor. Id. at 421. In other words, he was speaking as an employee, not as a citizen. Id. "Garcetti requires a practical inquiry into whether an employee's expression was made pursuant to her official obligations, including both her day-to-day duties and her more general responsibilities." Trigillo v. Snyder, 547 F.3d 826, 829 (7th Cir. 2008). The plaintiff in Garcetti "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." Garcetti, 547 U.S. at 421. Similarly, the plaintiff in Spiegla spoke as an employee "when she reported [] possible misconduct to her superior and sought clarification of a security policy she felt may have been breached." See Spiegla, 481 F.3d at 967; see also Wackett, 642 F.3d at 581-82 (agency supervisor spoke in an official capacity at agency board meetings); Ogden v. Atterholt, 606 F.3d 355, 358-60 (7th Cir. 2010) (employee was acting in an official capacity when he drafted an internal memo formally requesting that his supervisor reorganize his department).[8]

---

[8] The plaintiffs suggest that Garcetti does not apply because Folino is plaintiffs' "co-employee," not their "employer." (Pls.' Resp. at 5 (citing Fairley v. Andrews, 578 F.3d 518, 524 (7th Cir. 2009).) But the plaintiffs cannot plausibly contend that Folino's actions did not "directly advance [her] employer's interest in maintaining an orderly workplace." Abcarian v. McDonald, 617 F.3d 931, 937 (7th Cir. 2010) (concluding that Garcetti applies to such

- 18 -

We conclude that Diadenko and Breen spoke as employees when they complained internally about Schurz's special education department.[9] Breen's statement at a staff meeting that the school was using outdated standardized tests to evaluate special-education students is certainly within the "general responsibilities" of a special education teacher. (Pls.' Supp. Stmt. (Dkt. 33) ¶ 37.) The fact that it is not a "core" function does not alter our conclusion. See Davis v. Cook County, 534 F.3d 650, 653 (7th Cir. 2008) ("While drafting letters of complaint may not be a core job function of a nurse, a 'focus on core job functions is too narrow after Garcetti, which asked only whether an employee's expressions were made pursuant to official responsibilities.'") (quoting Spiegla, 481 F.3d at 966). The same reasoning applies to Diadenko's internal complaints about Condie's work hours and qualifications, the provision of calculators for special education students (whether they should be provided by the school or the students themselves), and the number computers and functioning copy machines available to teachers. (Defs.' Stmt. ¶¶ 42, 88, 94.) These complaints are not entitled to First Amendment protection because they fall within special-education teachers' general duty

---

employees).

[9] It does not appear that Chiodo made any internal complaints that are even arguably entitled to First Amendment protection. (See Pls.'s Supp. Stmt.(Dkt. 33) ¶¶ 1-20 (listing a series of complaints that Chiodo made to people outside the school).)

- 19 -

to educate their students. See Davis, 534 F.3d at 653-54 (nurse spoke as an employee in an internal hospital memo "discuss[ing] patient care, advocat[ing] on behalf of patients (as well as herself and similarly situated nurses), and detail[ing] difficulties encountered in working with doctors"). The emails that led to Diadenko's three-day suspension in October 2009, and Breen's emails to his college professor, are a somewhat closer question insofar they were sent to individuals outside the school. (See Defs.' Stmt. ¶¶ 49-50 (Diadenko sent emails to "staff at Schurz High School as well as North Grand High School and Mather High School"); see also id. at ¶ 74 ("Breen began to question the procedures at Schurz by emailing his college teachers and asking whether the practices at Schurz were normal.").) But so far as the record discloses, Diadenko's email concerned information specific to one of her students. Her substantive defense to the charge that these emails were improper — that she was "permitted to convey information to anyone that had any educational interest in the student," (Pls.' Resp. to Defs.' Stmt. ¶ 50) — only underscores that Diadenko was acting within her "general responsibilities" as a special-education teacher. Trigillo, 547 F.3d at 829. As for Breen, the only evidence the parties cite about the contents of his emails indicates that he was seeking guidance about Schurz's practices, (see Defs.' Stmt. ¶ 74), not "contributi[ng] to the civic discourse." Garcetti, 547 U.S. at 422.

- 20 -

On the other hand, courts applying <u>Garcetti</u> have tended to find that employees speak as citizens when they voice their concerns publically and/or outside the usual chain of command. <u>See, e.g.</u>, <u>Freitag v. Ayers</u>, 463 F.3d 838, 855 (9th Cir. 2006) (correctional officer spoke as a citizen by sending letters to a state legislator and the state inspector general) (cited with approval by <u>Spiegla</u>, 481 F.3d at 967); <u>see also</u> <u>Milwaukee Deputy Sheriff's Ass'n v. Clarke</u>, 574 F.3d 370, 377 n.3 (7th Cir. 2009) ("Schuh drafted his statement while off-duty, he reported the conduct externally, and no evidence indicates that the speech was 'pursuant to' or 'owe[d] its existence to' his official duties.") (quoting <u>Garcetti</u>, 547 U.S. at 421). The defendants emphasize that the plaintiffs witnessed the alleged problems that they reported to the OIG and others in the course of doing their jobs. But the question under <u>Garcetti</u> is whether the plaintiffs spoke *pursuant to* their official duties, not whether their speech was somehow *related to* their official duties. In <u>Milwaukee Deputy Sheriff's Ass'n</u>, the Milwaukee County Sheriff gave a deputy police officer an undesirable assignment after the officer wrote a newspaper article criticizing the Sheriff. <u>Milwaukee Deputy Sheriff's Ass'n</u>, 574 F.3d at 373-74. The Sheriff argued in the district court that the officer was speaking "as an employee" under <u>Garcetti</u>, but abandoned that position on appeal. <u>Id.</u> at 377. Our Court of Appeals called it a "wise" concession as "[t]he only connections between [the

deputy's] speech and his employment were that Sheriff Clarke was his superior and that he learned of Clarke's conduct through his position as a deputy." _Id._ at 377 n.3.  This reasoning persuades us that the defendants are not entitled to summary judgment with respect to the plaintiffs' complaints to the OIG and others.  They reported alleged misconduct "externally," _id._, and there is no evidence indicating that school secretaries and special-education teachers have a duty to report alleged misconduct to government officials outside the school.  As this is the only argument that the defendants have made for finding the plaintiffs' speech unprotected, we will move on to the next element of plaintiffs' claims for retaliation.

### 2.  Whether the Plaintiffs' Allegedly Protected Speech Caused the Defendants' Adverse Employment Actions

At the summary judgment stage in a retaliation case, the burden of proof on causation is "split between the parties." Kidwell v. Eisenhauer, 679 F.3d 957, 965 (7th Cir. 2012). "Initially, to establish a prima facie case of retaliation, the plaintiff must produce evidence that his speech was at least a motivating factor — or, in philosophical terms, a 'sufficient condition' — of the employer's decision to take retaliatory action against him.  Then, the burden shifts to the employer to rebut the causal inference raised by the plaintiff's evidence. If the employer fails to counter the plaintiff's evidence, then the employer's retaliatory actions are considered a 'necessary

condition' of the plaintiff's harm, and the plaintiff has established the but-for causation needed to succeed on his claim." Id. (citations omitted). The plaintiffs can meet their burden with either direct or circumstantial evidence. Id. Direct evidence establishes retaliation "without reliance upon inference or presumption." Id. (citations and internal quotation marks omitted). "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." Id. at 966 (quoting Long v. Teachers' Retirement Sys. of Ill., 585 F.3d 344, 350, (7th Cir. 2009)). The plaintiffs cite circumstantial evidence only. (See Pls.' Resp. at 6-10.)

### a. Chiodo

There are several employment actions affecting Chiodo that we can quickly dispense with. Folino's decision to terminate Chiodo's overtime occurred months before Chiodo's first letter to the OIG in November 2008. Chiodo's purported threat to call the OIG in or around June 2008 — which she denies making, see supra — is not even arguably protected by the First Amendment. (Cf. Pls.' Resp. at 8.) Chiodo did not actually contact the OIG until November 2008, and Folino did not learn that she had contacted the OIG until December. (See Pls.' Resp. to Defs.' Stmt. ¶ 17.) Likewise, the decisions to remove Chiodo as Folino's secretary, to move her to a cubicle, and to remove asbestos tiles from her former work area all occurred

before she contacted the OIG. On the other hand, there is sufficient evidence in the record to support a finding that Curriere threw a plastic rat on Chiodo's desk after Folino learned that Chiodo had contacted the OIG. But the only evidence linking Folino to this incident is her then-secretary's statement to a CPS investigator that Curriere was in Folino's office for 20-30 minutes before the incident and that she saw Curriere emerge with a bag. (See Case Activity Report, dated Dec. 18, 2008, attached as part of Group Ex. 4A to Pls.' Resp.) This evidence is insufficient to raise a material factual dispute for trial. It would be pure speculation to find that, contrary to Folino's testimony, she knew what Curriere planned to do — or actually directed her to do it — based only on this evidence. See Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009) ("The nonmoving party must point to specific facts showing that there is a genuine issue for trial, and inferences relying on mere speculation or conjecture will not suffice.").

This brings us to the decisions in February 2009 to terminate Chiodo's duties as treasurer and to eliminate her parking spot. Although these events occurred after Chiodo's letters to the OIG, that alone is insufficient to survive summary judgment. If a plaintiff is relying on "suspicious timing" alone to support the inference of causation, then the alleged retaliation usually must occur within a "few days" after the employee's speech. Kidwell,

679 F.3d at 966. Otherwise, the inference that the employee's speech caused the employer to act is too speculative to survive summary judgment. <u>See</u> <u>id.</u> ("Suspicious timing may be just that — suspicious — and a suspicion is not enough to get past a motion for summary judgment.") (quoting <u>Loudermilk v. Best Pallet Co.</u>, 636 F.3d 312, 315 (7th Cir. 2011) (internal quotation marks omitted). Chiodo was removed as treasurer approximately two months after Folino first learned that Chiodo had contacted the OIG, and approximately five weeks after Chiodo's letter to Ciesil. There may have been other correspondence closer in time to Chiodo's demotion, but as we discussed before, plaintiffs have not specifically identified Chiodo's other communications (despite being given a second chance to do so). The passage of time does not necessarily mean that the plaintiffs cannot show that Chiodo's speech was a motivating factor in her demotion. <u>Cf.</u> <u>Sitar v. Indiana Dept. of Transp.</u>, 344 F.3d 720, 728 (7th Cir. 2003) (case involving alleged retaliation for complaints of sex discrimination: the timing of an employment action is not "dispositive in proving or disproving a causal link"). But they must point to some other evidence to establish their prima facie case, and they have failed to do so. The thrust of the plaintiffs' argument seems to be that the admitted animosity between Folino and Chiodo sufficiently supports causation to defeat summary judgment. (<u>See</u> Pls.' Resp. at 8.) But it is clearly not enough: as plaintiffs' own brief

- 25 -

indicates, the animosity between Folino and Chiodo significantly predated Chiodo's first allegedly protected communication and was based on something other than Chiodo's speech. (See id. ("The undisputed facts demonstrate that Folino was angry with Sally over the missing LSC evaluation in May 2008.").)

The same analysis applies to the decision regarding Chiodo's parking space: it is remote in time from the only allegedly protected speech that plaintiffs have adequately identified, and the plaintiffs have not articulated any other reason to infer that the decision was retaliatory. In fact, the only relevant evidence that either party cites on this issue supports the opposite conclusion: plaintiffs admit that renovations to make the school ADA compliant also caused other school employees to lose their parking spots. (See Pls.' Resp. to Defs.' Stmt. ¶ 28.) The plaintiffs contend that the ADA renovations were "pretext for retaliation (i.e., to force Chiodo to park much farther away)." (See Pls.' Resp. to Defs.' Stmt. ¶ 28.) But they have not cited any evidence suggesting that the renovations were unnecessary. The defendants' motion for summary judgment on Chiodo's claim for First-Amendment retaliation is granted.

### b. Diadenko

Although there is evidence that Diadenko complained to the ISBE as early as September 2009, the plaintiffs have not cited any evidence establishing precisely when she made those complaints.

- 26 -

This is critical information because, as we just discussed, an employee's allegedly protected speech and the employer's adverse action must occur "very close" in time to support an inference of causation. <u>Kidwell</u>, 679 F.3d at 966. Absent some other evidence indicating that her discipline was retaliatory, Diadenko cannot survive summary judgment by vaguely asserting that she spoke out at some unspecified time before she was suspended. <u>See, e.g.</u>, <u>Wright v. Illinois Dept. of Children & Family Services</u>, 40 F.3d 1492, 1500 (7th Cir. 1994) (a court cannot "typically draw strong conclusions from the mere fact that protected speech may have preceded an adverse employment decision"). The only allegedly protected statement we can specifically identify — albeit by reference to a separate document — is Diadenko's letter to the Mayor of Chicago in late November 2009. Obviously, Diadenko's three-day suspension in late October could not have been retaliation for a letter she had not yet sent. Her ten-day suspension in January 2010 was imposed after she sent this letter, but the plaintiffs have not cited any evidence indicating that Folino learned about the letter before suspending Diadenko. Also, the time between the letter and the suspension — approximately a month — is too long to support an inference of causation. <u>See Kidwell</u>, 679 F.3d at 967 (periods of two months and five weeks, respectively, "militate[d] against allowing an inference of causation based on suspicious timing").

- 27 -

The context of the discipline that Folino imposed also undercuts the inference that Diadenko's complaints were a motivating factor in her suspension. See id. (a "significant intervening event" will defeat a causation argument predicated on suspicious timing). Folino learned on December 10, 2009 that an LSC representative had received by mail a copy of an email that Diadenko had sent to Folino and others with personal information about one of Diadenko's students. Folino admitted during her deposition that she believed that Chiodo — not Diadenko — sent the letter enclosing Diadenko's email. (Folino Dep. at 120.) She believed, however, that Diadenko knew but refused to disclose the sender's identity. (Id. at 118, 120.) The defendants maintain that Folino suspended Diadenko "soley as a method of retaliation and to get Diadenko to name the offender." (Pls.' Resp. to Defs.' Stmt. ¶ 99.) First, even assuming that it was inappropriate to discipline Diadenko to pressure her to reveal the letter writer's identity, it would not be grounds for a claim of First Amendment retaliation. Second, the plaintiffs ignore the other stated grounds for the ten-day suspension. Diadenko's suspension was also based on her admitted refusal to participate in a student evaluation attended by Neiman without the presence of a union representative. Folino also accused Diadenko of referring to her as the "Italian Mafia" and a "Nazi concentration camp leader." Diadenko's half-hearted denials reinforce the conclusion that she

was properly disciplined for this conduct, too.[10]  Moreover, the specific accusations that led to Diadenko's discipline in January 2010 are consistent with other admitted instances of inappropriate and disruptive behavior by Diadenko.  (See, e.g., Defs.' Stmt. ¶¶ 48 (Diadenko "screamed at Neiman in front of a parent and child, and walked out of the child's IEP meeting."); id. at 51 (other staff members complained to Folino about Diadenko's disruptive behavior); id. at 97 (Diadenko gave a children's book about honesty to an assistant principal she accused of being dishonest).) Diadenko's complaints about Schurz's special-education department did not "immunize" her from discipline for "inappropriate workplace behavior."  Kidwell, 679 F.3d at 967 (quoting Hall v. Bodine Elec. Co., 276 F.3d 345, 359 (7th Cir. 2002)) (internal quotation marks omitted).  The defendants' motion for summary judgment on Diadenko's claim for First Amendment retaliation is granted.

**c.  Breen**

With respect to Breen, the plaintiffs cite two instances of alleged retaliation: (1) Folino's statement to Breen ordering him not to "break ranks;" and (2) criticisms of Breens' teaching performance by Folino and others.  (Pls.' Resp. at 9.)  First, the plaintiffs have not cited any evidence supporting their contention

---

[10]/  Diadenko admitted that she used the phrase "Italian Mafia" in reference to Folino, but insisted that she was just paraphrasing what others had said about her.  (Diadenko Dep. at 164.)  And she admitted saying that she "felt like a Jewish person in the concentration camp surrounded by two Nazis."  (Id. at 165.) Diadenko insists that she was just describing her feelings, but that does not make the statement appropriate.

that Folino knew that Breen sent a letter to Poloko.[11]  Breen's
vague testimony that Folino told him not to break ranks "around the
time" he sent this letter is insufficient to create a material
factual dispute.  (Breen Dep. at 40; see also id. at 117 (arguing
in a circular fashion that Folino must have known about Breen's
complaints to the Board because the alleged instances of
retaliation coincided with his complaints).)  Because we have
already concluded that Breen's internal complaints are not entitled
to First Amendment protection, his failure to cite evidence that
Folino knew that he sent a letter to Poloko is fatal to his claim
for First Amendment retaliation.  See Wackett, 642 F.3d at 582
(defendants entitled to summary judgment where the plaintiff failed
to present any evidence that the defendants knew about the
plaintiff's allegedly protected speech).

     We turn now to the criticism of Breen's teaching performance.
Even assuming that plaintiffs had cited evidence indicating that
Folino was aware of Breen's allegedly protected speech, the
circumstantial evidence that Folino criticized his performance
because of his speech is insufficient to create a genuine factual
issue.  The plaintiffs rely primarily on Lang v. DCFS, 361 F.3d 416
(7th Cir. 2004), but the facts of that case are very different than
our own.  In Lang, the plaintiff had received positive performance

---

        11/  Poloko testified that he had no recollection of ever receiving such a
letter.  (See Poloko Dep., attached as Ex. K to Defs.' Stmt., at 35-36, 38.)

reviews for five years prior to his complaint of racial discrimination. See id. at 419. After he complained, he was faced with several accusations of "unexcused absences" that later proved unfounded, and his supervisor began issuing frequent written criticisms of his work. Id. at 419-20. Besides the suspicious timing and questionable validity of the supervisor's criticisms, there was also evidence that the supervisor was applying employer policies unreasonably. See id. at 420 (citing instances where the plaintiff's supervisor imposed requirements the plaintiff could not realistically satisfy). The totality of these circumstances led the Court to conclude that the plaintiff was entitled to proceed to trial. Id. at 421. By contrast, Breen was a new teacher in 2009 without any track record. Consequently, the fact that Folino and others criticized Breen for being disorganized is not suspicious in and of itself. See Burks v. Wisconsin Dept. of Transp., 464 F.3d 744, 758 n.17 (7th Cir. 2006) (distinguishing Lang on the grounds that the plaintiff in Burks had been employed less than a year when she began receiving negative performance reviews). The plaintiffs contend that Breen was a better teacher than Folino's criticisms would suggest, relying on Breen's assessment of his own performance. (See Pls.' Resp. to Defs.' Stmt. ¶¶ 70, 81).) But they have not cited, nor are we aware of, any authority holding that an employee's subjective beliefs about his own performance are sufficient to survive summary judgment on a claim for First

Amendment retaliation. In analogous employment-discrimination cases, such evidence is usually insufficient to defeat summary judgment because the ultimate question is not whether the employer correctly evaluated the plaintiff's performance, but instead whether the employer terminated the employee for an improper reason. See, e.g., Dey v. Colt Const. & Development Co., 28 F.3d 1446, 1460 (7th Cir. 1994) (self-serving testimony that an employee performed adequately "generally is insufficient to raise a question of fact about an employer's honest assessment of inadequate performance"); Gustovich v. AT&T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992) (similar); cf. Kuhn v. Ball State University, 78 F.3d 330, 332 (7th Cir. 1996) ("Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths; unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter.").[12] These cases persuade us that Breen's disagreement with Folino's assessment does not create a material factual dispute. Finally, the plaintiffs' argument that Folino imposed an unreasonable standard of performance is conclusory and not supported by any citation to the record. (See Pls.' Resp. at 9.)

---

[12]/ An employee may create a triable issue by specifically refuting purported deficiencies. See Dey, 28 F.3d at 160; cf. Lang, 361 F.3d at 419 (employee produced evidence that his supervisor's accusations of unauthorized absences were unfounded). But Breen merely "disagree[s]" with Folino's assessment. (See Defs.' Stmt. ¶ 81.)

- 32 -

The defendants' motion for summary judgment on Breen's claims for First Amendment retaliation is granted.[13]

## C. **Monell** Liability

The plaintiffs seek to impose <u>Monell</u> liability against the Board based upon an alleged policy or practice of "deliberate indifference to whistleblowers." (Pls.' Resp. at 11.) Without an underlying constitutional violation, their <u>Monell</u> claim against the Board fails. <u>See</u> <u>Sallenger v. City of Springfield, Ill.</u>, 630 F.3d 499, 505 (7th Cir. 2010) ("[B]ecause there is no underlying constitutional violation, the City cannot be liable under <u>Monell</u>.").

## D. State Law "Whistleblower" Claims

The plaintiffs have asserted claims under three separate statutory "whistleblower" provisions. <u>See</u> 105 ILCS 5/34-2.4c(b) (Count IV); 740 ILCS 174/10 and 174/20 (Count V). Section 34-2.4c of the Illinois School Code provides that "[n]o disciplinary action may be taken against any employee . . . for the disclosure of information by that employee . . . that evidences (1) a violation of any law, rule, regulation, or policy, or (2) waste, fraud, mismanagement, abuse of authority, or a danger to the health or safety of a student or the public." 105 ILCS 5/34-2.4c(b). A violation of this section is a Class A misdemeanor. <u>Id.</u> at § 34.2-

---

[13]/ Because we have concluded that plaintiffs' claims fail on their merits, it is unnecessary to reach Folino's qualified-immunity defense.

4c(c). There is no indication on the face of this provision that employees have a private right of action, and two courts in this district have held that there is no such right. See Frazier v. Board of Educ. of City of Chicago, No. 03 C 0755, 2003 WL 21510328, *5 (N.D. Ill. June 27, 2003); Burke v. Chicago School Reform Bd. of Trustees, 169 F.Supp.2d 843, 848 (N.D. Ill. 2001).[14] We agree with these decisions; defendants' motion for summary judgment on plaintiffs' claim for alleged violations of § 34.2-4-c(c) (Count IV) is granted.

The plaintiffs have also asserted claims under the Illinois Whistleblower Act. They specifically cite 740 ILCS 174/10, which prohibits employers from maintaining policies preventing employees from disclosing illegal acts to "government or law enforcement" agencies, and 740 ILCS 174/20, which prohibits employers from retaliating against employees who refuse to participate in illegal acts. With respect to Section 10, there is no evidence of any formal policy or rule preventing employees from contacting government agencies about wrongdoing. An employer might have an unwritten policy to the same effect, but for the reasons we discussed in connection with plaintiffs' retaliation claims, there

---

[14]/ There is some ambiguity in Burke about whether the court was addressing 105 ILCS 5/34-2.4 or 740 ILCS 175/4(b), a separate whistleblower provision. Compare Burke, 169 F.Supp.2d at 844 (citing 105 ILCS 5/34-2.4), with id. at 848 (citing 740 ILCS 175/4(b)). We agree with the Frazier court that Burke's reference to 740 ILCS 175/4(b) was an oversight and that the court in fact ruled that there is no private right of action under § 34-2.4. See Frazier, 2003 WL 21510328, *5 n.2.

- 34 -

is insufficient evidence that defendants maintained or enforced such a policy to survive summary judgment. With respect to Section 20, the defendants point out that the plaintiffs have not cited evidence that they ever refused to participate in allegedly illegal acts. See Robinson v. Alter Barge Line, Inc., 513 F.3d 668, 670 (7th Cir. 2008) (no violation where the plaintiff failed to show that he refused to participate in illegal activity). Section 15 of the Whistleblower Act, prohibiting retaliation for reporting illegal acts to outside agencies, is probably a better fit for the plaintiffs' claims. But they have not cited that provision in their complaint or their response to the defendants' summary-judgment motion. See Nelson v. Napolitano, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."). Even with respect to the Whistleblower Act provisions that they have cited, the plaintiffs' argument is cursory and not supported by any case law. (See Pls.' Resp. at 12.) The defendants' motion for summary judgment on plaintiffs' Whistleblower Act claims (Count V) is granted.

**E.   IIED (Count VI)**

To prevail on their IIED claims, the plaintiffs must show: (1) that the defendants' conduct was "truly extreme and outrageous;" (2) the defendants intended to inflict severe emotional distress, or at least knew that there was a high probability that their

conduct would cause severe emotional distress; and (3) the defendants' conduct in fact caused severe emotional distress. <u>Harriston v. Chicago Tribune Co.</u>, 992 F.2d 697, 702 (7th Cir. 1993) (quoting <u>McGrath v. Fahey</u>, 533 N.E.2d 806, 809 (Ill. 1988)) (internal quotation marks omitted). The plaintiffs' response to the defendants' motion for summary judgment cites only one purported instance of "extreme and outrageous" conduct: the incident involving the plastic rat. (<u>See</u> Pls.' Resp. at 13.) Even assuming that this was "extreme and outrageous" conduct, we have already held that there is insufficient evidence linking Folino to this incident to create a triable issue. The defendants' motion for summary judgment on the plaintiffs' IIED claims (Count VI) is granted.

**F.   Asbestos Exposure (Count III)**

It is unclear from plaintiffs' complaint what legal theory underpins Chiodo's "asbestos exposure" claim, and their one-paragraph discussion of that claim in their response brief does not shed any light on that question. (<u>See</u> Compl. ¶ 37 (referring to unspecified OSHA regulations); <u>see also</u> Pls.' Resp. at 11.) They have not cited any legal authority supporting Chiodo's claim, and their one reference to the record is indecipherable.[15]   Even

---

[15]/   The plaintiffs cite "Chiodo deposition exhibit #4 @ 22-letter from attorney Ciesel [sic]." (Pls.' Resp. at 11.) Exhibit 4 to Chiodo's deposition is apparently the plaintiffs' response to defendants' interrogatories, only the first page of which is included in the parties' summary judgment materials. As far as we can tell, there is no letter from Ciesil in the materials that the parties have submitted to the court.

- 36 -

assuming that Chiodo had articulated some legal theory that might entitle her to relief, she has failed to come forward with any evidence supporting her claim. The defendants cite a report indicating that there was only de minimis asbestos in the area where the renovation work was performed and that the work had not released any carcinogens. (See Defs.' Stmt. ¶ 22.) The plaintiffs admit this allegation "but do not necessarily vouch for the accuracy of the reporter's conclusions." (Pls.' Resp. to Defs.' Stmt. ¶ 22.) They have not cited any evidence undermining the report, or any evidence that Chiodo has been injured. (Cf. Pls.' Resp. at 11 (asking the court to "wait to see if there are any medical symptoms at the time of trial").) The defendants' motion for summary judgment on Chiodo's claim for "asbestos exposure" (Count III) is granted.

## CONCLUSION

The defendants' motion for summary judgment [24] is granted.

DATE:        August 20, 2012

ENTER:       _____
             John F. Grady, United States District Judge